UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
VICTOR FALCON,

                          Plaintiff,

      -against-

THE CITY OF NEW YORK, THE NEW YORK
POLICE DEPARTMENT ("NYPD"), NYPD DET.
SGT. JOHN K. WONG, NYPD DET. SGT ANN MARIE
GUERRA, NYPD CHIEF VINCENT DIDONATO,
NYPD CAPTAIN JOHN MENONI, NYPD SGT.
STEPHEN WILLIAMS and NYPD LT. RYAN MCCARTAN
(Individually and in their Respective Capacities as
Officers)

                          Defendants.
------------------------------------------------------------X

**Civ. No. 19-cv-3322 (ENV)(RLM)**

**AMENDED COMPLAINT**

**(Jury Trial Demanded)**

     Plaintiff, Detective VICTOR FALCON ("Plaintiff' or "Plaintiff Falcon"), by and through his attorneys, L & DLA W PC (Liggieri & Dunisha), complaining of Defendants, jointly and several1y, herein respectfully shows to this Court and alleges the following:

## NATURE OF THE CASE

I.     This is an action in which the Plaintiff seeks relief for Defendants' violations, under color of state law, of his rights, privileges and immunities secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the State of New York.

2.     Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C § 2000e et. Seq. ('Title VII"), and to remedy violations of the laws of the State of New York, based upon diversity and the supplemental jurisdiction of this Court pursuant to Gibb, 38 U.S. 715 (1966) and 28 U.S.C. § 1367. seeking relief and damages to redress the injuries Plaintiff has suffered as a result of being sexually assaulted/harassed, discriminated and retaliated against by his employer on the basis of gender discrimination, sex discrimination and

retaliation inflicted upon Plaintiff by Defendants.

3.      Defendants engaged in a pattern and practice of committing retaliation against NYPD officers that filed protected complaints of sexual harassment, discrimination, retaliation, corruption and official misconduct.

4.      Plaintiff also complains pursuant to the statutory and common law of the state of New York and New York City under all laws pertaining to assault, the New York City Gender Motivated Violence Protection Act and the New York City Whistleblower Protection Act

5.      The Defendants had prior knowledge of the unlawful pattern and practices of the NYPD

## JURISDICTION AND VENUE

6.      Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. §§ 1331 and the Civil Rights Act of 1866 and 1871 which give this Court jurisdiction for each statute; the damages; exclusive of interest and costs in this instance exceed that of all lower courts, and this Court's pendent jurisdiction is also invoked.

7.      The unlawful employment practices alleged herein occurred wholly or m part, in the jurisdiction of the Eastern District of New York.

## JURY DEMAND

8.      Plaintiff hereby demands a trial by jury on all issues properly triable thereby.

## PARTIES

9.      Plaintiff Victor Falcon is an individual Latino American male who resides in the State of New York, Kings County.

10.     Defendant, The City of New York, is a municipal corporation, incorporated in the State of New York, and resides in all five boroughs of New York City. The causes of action in this case arise within the boroughs of the City of New York.

11.     The City of New York assumes the risk incidental to the maintenance of a police department and the employment of police officers.

12.   The Police Department of the City of New York has their headquarters in New York County, which is located at 1 Police Plaza Path, New York, NY 10007.

13.   At all relevant times, the City acted through its agency, the New York Police Department (the "NYPD"), to commit the acts alleged in this Complaint and were responsible for such acts.

14.   A substantial and significant portion of the events took place at the NYPD 72nd Precinct, which is located at 830 4th Avenue, Brooklyn, NY 11232.

15.   Defendant Ann Marie Guerra was and is a Detective Sgt. with the NYPD and at all times material, acted under the color of law and in her official capacity.

I6.   Defendant Guerra is a resident of the State and City of New York

17.   Defendant Johnathan K. Wong was and is a Lieutenant Sgt. with the NYPD and at all times material, acted under the color of law and in his official capacity.

18.   Defendant Wong was and is a resident of the State and City of New York.

19.   Defendant Ryan Mccartan was and is a Lieutenant with the NYPD and at all times material, acted under the color of law and in his official capacity.

20.   Defendant Mccartan was and is a resident of the State of New York.

21.   Defendant Vincent DiDonato was and is a Chief with the NYPD and at all times material, acted under the color of law and in his official capacity

22.   Defendant DiDonato was and is a resident of the State of New York

23.   Defendant Stephen Williams was and is the current Chief of Detectives in the NYPD's Investigations Unit, and at all times acted under the color of law and in his official capacity.

24.   Defendant Williams was and is a resident of the State of New York

25.   Defendant John Menoni was and is an NYPD Captain within the NYPD's Brooklyn South Detectives Bureau.

26.   Defendant Menoni was and is a resident of the State of New York

27.   At all times relevant, the above-named defendants were acting within their official capacities

as members of the NYPD.

28.     Defendants Guerra and Wong, along with the other named Defendants, assisted and/or conspired to and/or acted in concert and/or did engage in the violations of Plaintiffs constitutional rights. During all times mentioned herein, the Defendants acted under the color of law, to wit, under color of constitution, statutes, ordinances, laws, rules. regulations, policies, customs and usages of the State of New York and/or the City of New York.

29.     At all times relevant to this action, Defendants Guerra, Wong and all other named Defendants had the power and the duty to restrain themselves and other police officers from committing unlawful acts against the Plaintiff and had a duty to not violate the law and the rights of the Plaintiff.

30.     At all times relevant to this action, the City of New York acting through the NYPD, had the duty to properly supervise police officers at the precincts named herein and failed to so even though they possessed the authority.

### PRELIMIANRY STATEMENT

### GOOD COP

Plaintiff Detective Victor Falcon is a good cop and a dedicated and loving father to his special need's daughter. Detective Falcon grew up in Brooklyn, New York and had one goal; to protect the community he grew up in. On or about January 10, 2005, the City Defendants hired Det. Falcon. Immediately thereafter, Det. Falcon worked assiduously to ensure that New Yorkers could live in a safe environment. Every NYPD Officer knows, and Det. Falcon understood, that good police work demands unprecedented dedication and an unwavering work ethic. Moreover, even when officers shed their uniform and are off duty, their responsibilities to the community never go away. Det. Falcon exemplified such dedication which led to his promotion as a detective and to the unfolding of high-profile cases solved by Det. Falcon. In fact, after being promoted to the rank of Detective at the 72nd Precinct, Det. Falcon unraveled

the mystery of the so called "Comic Book Caper" when he was able to recover thousands of dollars in stolen comic books by using good police work. Det. Falcon carried this work ethic with him throughout his career and was well known for bringing inspiration for other officers around him at the Precinct.

<u>BAD COP</u>

Defendant Sgt. Ann Marie Guerra (hereinafter Defendant Guerra), was the second-in-command at the 72nd Precinct Detectives Squad, where Det. Falcon also worked. Upon information and belief, City Defendants promoted Defendant Guerra to the prestigious NYPD Command Unit of the 17th Precinct Detective Squad located in Manhattan after she sexually assaulted, harassed, degraded and retaliated against Det. Falcon in front of precinct officers and staff.

On or about October 7, 2018, Det. Falcon made a protected complaint to his Supervisor, Defendant Guerra. Det. Falcon specifically advised Defendant Guerra that since he was a male, and the Precinct bathroom was unisex, it was inappropriate and unwelcomed for Defendant Guerra to leave her soiled underwear hanging in the bathroom. Upon hearing this protected complaint on account of gender, Defendant Guerra retrieved her soiled panties and in a twisted fit of rage; sexually assaulted Det. Falcon by jamming her dirty panties into Det.  Falcon's mouth while screaming "They are fucking clean." Defendant Guerra's unlawful and egregious sexual assault against Det. Falcon was the straw that broke the camel's back.  Defendant Guerra's actions shocked the conscious and followed a string of unlawful behavior that City Defendants directed at the Plaintiff, which are outlined in the facts of this Complaint.

**<u>THE AFTERMATH</u>**

After Defendant Guerra sexually assault and discriminated against Det. Falcon, Det. Falcon filed a protected complaint with the NYPD's internal Equal Employment Opportunity Office (hereinafter "NYPD EEO"). Upon making this complaint, which was ostensibly

onfidential, the Defendants launched a retaliatory campaign to silence the Plaintiff and force him from the job; by any means necessary. The facts allege and the evidence shows a litany of retaliatory and adverse employment actions taken against Det. Falcon. First, Defendant Sgt. Wong (a friend to Defendant Guerra), began berating Det. Falcon at work, increased his workload, and forced Det. Falcon from his office space at the precinct. Second, Defendant Sgt. Wong initiated an unapproved and malicious personal investigation against Det. Falcon while using his badge, under the color of law, to keep tabs on Det. Falcon so he could entrap Det. Falcon. Third, after Det. Falcon underwent severe retaliation at the precinct, he attempted to complain, but the NYPD EEO refused to process Det. Falcon's complaints. Fourth, the Defendants subjected Det. Falcon to false write-ups, even though Det. Falcon had a clean work record. Fifth, Defendants detailed Det. Falcon out of his precinct to less prestigious details, denied Det. Falcon union assistance, and denied Det. Falcon of all due process. Sixth, and most egregious, after complaining of official NYPD misconduct, Defendants conspired to have Det. Falcon involuntarily committed to a psychiatric facility so they could strip Det. Falcon of his gun and shield.

The above examples are just a few of the many retaliatory measures that the Defendants used to target Det. falcon. To this very day, the Defendants continue to retaliate against Det. Falcon in an effort to create a hostile work environment that forces Det. Falcon from his job. However, Det. Falcon is resilient. Detective Falcon has always and will always be a good cop. The question is whether City Defendants will allow bad cops to destroy his career before it is too late.

## Facts

31.   On or about January I 0, 2005, Defendant NYPD acting as an agency for City Defendants, hired Plaintiff Falcon.

32.   Plaintiff Falcon is a highly decorated detective of the NYPD, who has loyally and faithfully

served the citizens of New York City for well over a decade. Moreover, Plaintiff Falcon is a detective, who, through his diligence, perseverance and clever police work has solved many high-profile cases which include several murders.

33. Defendant Guerra subjected the Plaintiff to routine unwelcomed sexual harassment, along with crude, vulgar and highly inappropriate sexually charged comments in furtherance of a hostile work environment.

34. On at least one occasion, Defendant Guerra made inappropriate and unwanted physical contact with Plaintiff Falcon which were sexual in nature and made against Plaintiff Falcon on account of his gender as a male.

35. At all times relevant Defendant Guerra sexually harassed, created a hosti1e work environment, and made egregious unlawful comments to and around Plaintiff Falcon on a regular basis.

36. By way of example, in or around the latterhalfof2017, Plaintiff made mention of an individual he was dating while speaking to several co-workers. The conversation was sincere and lighthearted; however, Defendant Guerra became malicious and told Plaintiff Falcon "If she doesn't call you back its because you've got a little dick!"

37. The routine unlawful and sexually charged behavior in furtherance of a hostile work environment continued when Defendant Guerra told Plaintiff during an office conversation that "I was home alone masturbating, and my husband came home. He tried to join in, and I told him 'What the fuck? This isn't an invitation!'"

38. Plaintiff Falcon made protected complaints to supervisors regarding the frequent unlawful and unprofessional comments and conduct of Defendant Supervisor Guerra, which were either directed at Plaintiff Falcon or made in or around his presence in furtherance of a hostile work environment.

39. Following Plaintiff Falcon's protected complaints, Defendant Guerra and Defendant Wong, who were Plaintiff Falcon's direct supervisors, initiated a discrimination campaign of

retaliation and hostility which were targeted against Plaintiff Falcon.

40.     The above campaign included but was not limited to (i) denying shift changes to  Plaintiff Falcon which allowed him to attend necessary court appearances related to the custody of his daughter, (ii) forcing Plaintiff to reschedule court appearances and refusing to authorize any of Plaintiff Falcon's overtime requests despite fulfilling such requests for any officer similarly situated but who did not made a protected complaint, (iii) unreasonably delaying the authorization of overtime sheets in an effort to prohibited timely payment of wages due to the Plaintiff and (iv) refusing transfer requests that would permit Plaintiff Falcon to work at a different location which was away from Defendant Guerra's supervision and misconduct.

41.     Throughout the calendar years of 2017 and 2018, Plaintiff Falcon requested a number of reasonable accommodations to care for his minor special need's daughter.

42.     Defendants were aware of the child's diagnosed disability and upon information and belief, similarly situated employees were granted reasonable accommodations to care for immediate disabled family members. However, when Plaintiff Falcon made such requests for a reasonable accommodation, such as being switched off the late-night shift from time to time, the Defendants denied the Plaintiff's request without even so much as an interactive discussion.

43.     Upon information and belief, even detectives without any disability or disabled family members, were granted accommodations by Defendant Wong and Defendant Guerra.

44.     Even more telling, were the actions taken by Defendant Wong to promote less experienced and junior detectives instead of Plaintiff Falcon, even though Plaintiff Falcon was more experienced.

45.     On numerous occasions Defendant Wong refused to sign Plaintiff Falcon's overtime sheets, discarded overtime sheets handed in by the Plaintiff direct to Defendant Wong, and on at least one occasion, ordered Plaintiff Falcon to drive to a separate command,  while off duty, to have  a different sergeant sign Plaintiff's overtime sheet (simply because Defendant Wong  refused

to do so in retaliation and in furtherance of a hostile work environment on account of Plaintiffs protected complaints).

46.   In or around late October of 2017, City and NYPD Defendants hosted a Halloween costume party.

47.   Prior to attending the costume party, Plaintiff Falcon obtained approval for a gag costume with including a miniature prosthetic penis. The purpose of the costume was no more than a joke.

48.   Upon information and belief, officers similarly situated over the years had donned similarly costumes as jokes.

49.   During the Halloween party, Defendant Guerra approached Plaintiff Falcon and demanded to be photographed with the Plaintiff.

50.   Plaintiff was reluctant, but also did not want to be insubordinate or further any retaliatory acts which Defendant Guetta had perpetrated against him. Thus, Plaintiff Falcon followed the order of Guerra and was photographed with Defendant Guerra despite being under duress.

51.   The aforementioned Halloween party was one of many parties hosted by City and NYPD Defendants that the Plaintiff actually attended.

52.   Both before and after Defendants' Halloween party, Plaintiff Falcon had lodged protected complaints with Defendants' Lieutenant McCartan as well as Defendants' Zone Captain Menoni regarding the discriminatory, retaliatory and sexually harassment behavior and actions of Defendant Guerra and Wong.

53.   No actions were taken by Lt. McCartan or Cpt. Menoni, or any of the other Defendants' supervisors, despite their official responsibility to properly investigate and address Plaintiff Falcon's complaints.

54.   Throughout this time period, Defendants continued to grant overtime authorizations and shift adjustments to numerous detectives that were similarly situated to the Plaintiff, but who did not make complaints of discrimination or harassment.

55.     Since the Defendants refused to address Plaintiff Falcon's complaints or take any remedial action, Defendant Guerra was permitted to continue her egregious and unlawful behavior which only became worse.

56.     Defendant Guerra's sexually charged and unlawful behavior reached full throttle on October 7, 2018.

57.     On or about October 7, 2018, Plaintiff Falcon observed, as he had many times before, Defendant Guerra's soiled underwear on the fixtures and fittings of the Precinct's communal unisex bathroom and locker room.

58.     Since the bathroom was unisex, Plaintiff Falcon respectfully approached Defendant Guerra to make a protected complaint related directly to Plaintiff Falcon's gender.

59.     Plaintiff explained to Defendant Guerra that since Plaintiff Falcon was a male, and both sexes used the same bathroom, it would be more respectful for Defendant Guerra to not leave soiled underwear in the bathroom. Rather it would be better to leave the soled underwear in Defendant Guerra's locker.

60.     In a fit of rage, Defendant Guerra ignored all protocol, retrieved her soiled undenvear and violently shoved them into Plaintiff Falcon's mouth and then aggressively rubbed them all over Plaintiff Falcon's face. The soiled undergarment touched Plaintiffs teeth, gums, interior cheeks and tongue.

61.     The sexually charged and violent gender motivated assault left Plaintiff Falcon traumatized and in complaint shock.

62.     As the violent gender motivated assault raged on, Defendant Guerra screamed in the Plaintiff's face and said "See? They Are Fucking Clean!"

63.     Even prior to the sexual assault, Guerra's unlawful and sexually inappropriate comments were notorious and unlawful. For example, Defendant Guerra told Plaintiff Falcon "There's Nothing Wrong With [Plaintiff Falcon] Taking It In the Ass Because *My* Husband Does" during an

office conversation in which Plaintiff Falcon, a heterosexual male, was speaking cordially about a woman he took out on a  date.

64. The above unlawful and sexually charged outburst came after Defendant Guerra bragged to Plaintiff Falcon's co-workers, in the presence of the Plaintiff, that she inserts a 'dildo' into her husband's rectum during coitus.

65. When it became clear to Plaintiff Falcon, that no supervisor would cease their illegal behavior, or take any actions to prevent any further unlawful behavior, Plaintiff attempted to complain to Defendant NYPD's internal EEO.

66. However, Plaintiff Falcon's protected complaints to EEO fell on deaf ears. NYPD EEO refused to call Plaintiff Falcon in for an interview, refused to discipline Defendant Guerra or remove her away from Plaintiff Falcon, and refused to take any actions to end the sexually harassing and hostile work environment perpetrated by the Defendants.

67. Tellingly, the NYPD EEO, which is expected to be fair, accurate and thorough, closed Plaintiffs EEO complaint file in less than fifteen hours.

68. After a leak to the news media, various sources wrote of Defendant Guerra' s sexual advanced and Jude behavior against Plaintiff Falcon. After these reports were published, the NYPD EEO backtracked, and began to investigate Plaintiff Falcon's claims regarding Defendant Guerra's unlawful behavior.

69. On or about October 10, 2018, after making initial complaint with NYPD EEO, a phone call was made at an unknown time anywhere between 1O/l0 /18-10/1 1 /20 1 8 by the 72nd precinct detective squad delegate Donna Mazza called Victor Falcon and informed him that the NYPD EEO has told the 72nd precinct Detective squad LT. Ryan Mccartan the nature of  Victor Falcons complaints ( phone call was recorded and saved for  reference).

70. Furthermore, after Plaintiff Falcon' s allegations surfaced, Defendant Wong commenced a retaliatory campaign against Plaintiff Falcon.

71.     First, Defendant Wong changed the Plaintiffs working conditions, by physically pulling apart and then later removing Plaintiff Falcon's cubicle workstation, making it nearly impossible for the Plaintiff to complete his daily work.

72.     After the removal of Plaintiff's workstation was complete, Defendant Wong then yelled in Plaintiff Falcon's face, attempting to provoke a physical altercation and bait the Plaintiff, so that Plaintiff could be held in insubordination, suspended, or even arrested.

73.     The above altercation and many more, were witnessed by members of the Defendants' 72nd Detective Squad.

74.     On or about October 22, 2018, Defendant Wong once again attempted to provoke a physical altercation with Plaintiff Falcon by screaming in his face.

75.     The above unlawful retaliatory and hostile acts of Defendant Wong, were recorded by the Plaintiff who was fearful that he would lose his job or even worse, be placed in physical danger by the Defendants.

76.     On or about October 23, 2018, in further retaliation after information regarding Defendant Guerra's sexual improprieties and conduct made the news, upon information and belief Defendants leaked the photo taken at the NYPD Halloween party, depicting Plaintiff Falcon in his gag costume.

77.     The retaliatory and unlawful attacks against the Plaintiff escalated in the immediate aftermath of Plaintiff's protected NYPD EEO Complaint.

78.     On or about November 3, 2018, Defendant Wong told Plaintiff Falcon that any time the Plaintiff wanted to make a personal call, even to his attorney, Defendant Wong was to be notified of the call and to be apprised of the sum and substance of the conversation. If Plaintiff Falcon did not notify Defendant Wong, Wong advised that there would be disciplinary measures taken against the Plaintiff.

79.     The above is just one of many examples in which Defendant Wong and other Defendants used

their badge and authority to perpetrate misconduct against the Plaintiff while acting under the color of law.

80.   On or about December 3, 2018, Defendant Wong asked all personnel to leave the Detective's Squad office, so that Defendant Wong could harass the Plaintiff without having any witnesses around him.

81.   On or about December 4, 2018, Plaintiff falcon attempted to make a complaint to the NYPD EEO regarding the unlawful behavior of Defendant Wong. However, the evidence shows that the NYPD refused to acknowledge, read, or receive such a complaint from the Plaintiff.

82.   As a hard-working NYPD detective, Plaintiff Falcon was familiar with the culture and customs of the NYPD. He was fully aware that the NYPD was and is capable of subverting evidence of misconduct and wrongdoing. With this knowledge, Plaintiff Falcon recorded some of the aforementioned retaliatory and unlawful behavior which is set forth in the above paragraphs.

83.   Upon information and belief, Defendant Wong escalated his official misconduct, discriminatory and retaliatory behavior, while having the audacity to use his badge and act under the color of law, to open a secretive investigation against the Plaintiff.

84.   On or about December 26, 2018, at or around 12:00 P.M. EST., Defendant Wong began stalking Plaintiff Falcon, without any objective credible suspicion of wrong doing on the part of the Plaintiff.

85.   On or about December 26, 2018, Defendant Wong was captured on video tape, visiting Plaintiff Falcon's barbershop. Upon arrival at Plaintiffs barbershop, Defendant Wong used his authority while acting under the color of law in an effort to demand the whereabouts of Plaintiff Falcon. Defendant Wong harassed the Plaintiffs barbershop ower, demanding to know where the Plaintiff was, while simultaneously identifying himself with a false name but acknowledging he was an NYPD Sergeant.

86.   At all times relevant, Defendant Wong had no lawful reason for stalking Plaintiff Falcon while

the Plaintiff was off duty. Defendant Wong's actions did not rise to any of the levels necessary in order to perform an investigation.

87. Upon information and belief, Defendant Wong acted under the color of law to deprive the Plaintiff of his constitutional rights, without having authorization from superiors of Defendants.

88. Plaintiffs barbershop, located at 546 86th Street, Brooklyn, NY, falls within the jurisdiction of Defendant NYPD's 68th Precinct. Since the NYPD is known for community policing, the barbershop's owner immediately contacted the 68th Precinct in Defendant Wong's presence, as the owner was fearful that Defendant Wong was not a real police officer.

89. Upon inquiring with officers of the 68th Precinct *as* to whether they knew a NYPD Sgt. "Won" (as Defendant Wong falsely identified himself), an officer of the 68th Precinct stated that he was unfamiliar with such an NYPD officer.

90. Defendant Wong then interrupted the conversation between 68th Precinct Officers and the barbershop owner and corrected his name to "'Sgt. Wong."

91. In an effort to confirm Defendant Wong's identity, an officer of the 68th Precinct, asked to speak with Defendant Wong on the phone. An officer of the 68th Precinct asked for Defendant Wong's identity and stated purpose of business.

92. Defendant Wong responded that he was looking for "a perpetrator."

93. At this time, the Defendant Wong used his authority as an NYPD Sergeant and threatened the barbershop owner by stating "I really hope I don't have to come back here!"

94. Plaintiff Falco n' s barber informed the Plaintiff of the confrontation with Defendant Wong.

95. As a result of Defendant Wong's predatory and unlawful behavior, Plaintiff Falcon called Defendant NYPD's Internal Affairs Bureau to make a protected complaint regarding the barbershop incident with Defendant Wong as well as to notify IAB about the ongoing

retaliation and hostile work environment that Plaintiff Falcon was experiencing m the workplace.

96.     An investigator from IAB refused to process Plaintiff Falcon's complaint. Upon information and belief, IAB took no steps to address the Plaintiff's complaints and took no measures to prevent further unlawful action to the Plaintiff.

97.     On account of the above failures of the Defendants to protect the Plaintiff, Plaintiff Falcon would record some of the conversations held with superior officers in order to secure a record of his protected complaints and to preserve evidence of the retaliation and hostile work environment perpetrated by the Defendants.

98.     On or about January 9, 2019, Plaintiff recorded Captain Menoni, Lieutenant McCartan and Sergeant Catalano requested that Plaintiff stop recording interactions with NYPD members, but agreed to allowing Plaintiff Falcon to record any interactions with Defendant Wong.

99.     On or about January 10, 2018, Captain Menoni, Lieutenant McCartan, Sergeant Catalano and Inspector Murray (Brooklyn South executive officer in charge) asked the Plaintiff to sit down for a private meeting alleging that no union rep was necessary.

100.    Defendants Captain Menoni, Lieutenant McCartan, Sergeant Catalano and Inspector Murray again demanded that Plaintiff Falcon cease recording anyone within the office.

10l.    During this meeting Plaintiff informed and reminded all his supervisors of the sexual harassment and discrimination incidents that Plaintiff Falcon had endured and that this was the reason for documenting certain interactions.

102.    Plaintiff Falcon further advised all his supervisors about the incidents involving Defendant Wong, which included Defendant stalking the Plaintiff and his acquaintances, investigating the Plaintiff without cause and causing embarrassment to the Plaintiff in and around his community.

103.   Plaintiff Falcon further elaborated to his supervisors that the hostile work environment perpetrated by the Defendants also included but was not limited to (i) derogatory comments made about "Jews" and (ii) inappropriate sexual content toward children.

104.   After discussing the foregoing unlawful incidents, Lt. McCartan and Captain Menoni advised the Plaintiff, that under the circumstances, when Defendant Wong is present in the 72nd precinct detective squad, Plaintiff Falcon would be permitted to record interactions with him.

105.   *At* this meeting, the above Supervisors attempted to force Plaintiff Falcon to sign a write-up in regard to this case. Even though Plaintiff Falcon was making protected complaints for which there was substantial evidence, the Defendants still attempted to take an adverse employment action against the Plaintiff by forcing him to sign a write-up which would reflect poorly on Plaintiff Falcon's work performance.

106.   Oddly enough, upon information and belief, the write-up (a claim of discourtesy) was issued by NYPD Capt. Cerapano at the request of Defendant Wong.

107.   After Plaintiff Falcon refused to sign the write-up, Lt. Mccartan and Captain Menoni then stated that they did not want Plaintiff recording anyone under any circumstance including Defendant Wong.

108.   After this interaction, the Defendants escalated their retaliatory attacks against Plaintiff Falcon even further.

109.   In response to Plaintiff Falcon's protected complaints, Defendant Capt. Menoni issued an unofficial cease and desist letter to Plaintiff Falcon. The promulgated office policy set forth by the NYPD required that such letters be issued on a letterhead and dated. However, this particular letter was bereft of all such requirements.

110.   On or about January 11, 2019, when Plaintiff Falcon refused to sign the unofficial cease and desist letter, the Defendants took the following unlawful steps against the Plaintiff.

111.   First, Plaintiff Falcon was wrongfully and unexpectedly detailed at work. Second, Plaintiff Falcon was denied any due process during this time when he was denied both legal representation and union assistance related to his refusal to sign and involuntary work detail. Third, Defendants stripped Plaintiff Falcon of his service firearm and his back-up firearm.

112.   Plaintiff has no history of mental illness, has never requested psychological treatment and has never had poor work performance. However, in cinematic fashion, and in close proximity to Plaintiff's complaints of illegal conduct, Defendants Menoni and McCartan ordered the Plaintiff to undergo a psychological review.

113.   Upon information and belief, Plaintiff Falcon was not the first NYPD officer that Defendants attempted to force a psychological review, (colloquially referred to as an "I09"), after an officer made a complaint of unlawful conduct.

114.   Defendants had knowledge of similar unlawful conduct in light of the Adrian Schoolcraft case, in which Officer Schoolcraft complaint of NYPD misconduct and was held against his will in the psych ward of Jamaica Hospital for around six days.

115.   Despite Plaintiffs calm and coherent objections regarding the order to undergo a psychological review, and despite having knowledge of the previous claims, Defendant Menoni  and Defendant Mccartan, both stated that Plaintiff needed to be under   psychological   review because they believed that after several months of media coverage concerning  the Plaintiff's case, the Plaintiff could use what was referred to as a "step back" and "a break from case work."

116.   The psychological review of Plaintiff Falcon was approved by Defendant Menoni, Defendant McCartan, Inspector Gonzalez and most interesting; NYPD  Chief DiDonato.

117.   It was well known around the police precinct and amongst members of the NYPD tha1 Chief DiDonato was and is a close friend to Defendant Guerra.

118. Upon orders from the above Defendants, Plaintiff Falcon asked whether he would be receiving an official 109, which not only included a psychiatric evaluation, but could also include the Plaintiff being forced against his will to be remanded at a psychiatric facility for detention.

119. In response to Plaintiff Falcon's question, Defendant Menoni replied in the affirmative.

120. At this time, under orders to also be stripped of all weapons, Plaintiff Falcon informed Defendant Menoni of unloaded firearms located at the Plaintiff's residence.

121. Under orders from Defendant Menoni, Didonato and Inspector Gonzalez; NYPD Sergeant Caporale (66th precinct detective squad) and two other officers from the 72nd precinct, detained Plaintiff Falcon and drove him back to his residence in an unmarked police vehicle where they removed both firearms that were in Plaintiffs residence.

122. Plaintiff was then left in his residence with his thirteen-year old child who has special needs.

123. NYPD Sgt. Caporale returned around two hours later to Plaintiff Falcon's residence with two uniformed 72nd Precinct officers: NYPD Officer Tilan and NYPD Officer Baggs. The officers detained and falsely imprisoned Plaintiff Falcon in his residence without allowing him to leave.

124. The officers that detained Plaintiff Falcon presented two contradictory and equally unlawful reasons for detaining Plaintiff Falcon. First, officers advised Plaintiff Falcon that he was required to attend Lefrak Psychiatric Services for unknown reasons. Second, and in contradiction to the first reason, officers later advised Plaintiff Falcon that Defendant Menoni gave the officers an order to "psych" Plaintiff Falcon.

125. Since entering the NYPD in 2005, Plaintiff Falcon was aware of officers who were held in psychiatric facilities after making complaints of official misconduct and other unlawful acts. Having full knowledge of this, and prior to being taken to the psychiatric facility, Plaintiff phoned several people including his girlfriend, and requested that they film what was about to transpire.

126.   Plaintiff Falcon further told Sgt. Caporale that he knew the plan would be for the NYPD to order Plaintiff Falcon to see an NYPD psychiatrist who would rubber stamp an order for the Plaintiff to be placed on a seventy-two (72) hour observational hold. What the Plaintiff also knew, and what the Defendants understood, was that at the time Plaintiff Falcon would be in holding, the NYPD would be able to confiscate Plaintiff Falcon's personal cell phone for investigatory purposes, and there was a possibly the NYPD would place Plaintiff Falcon's special needs daughter into the custody of the Administration for Children's Services (A.C.S.).

**127.**   After PLAINTIFF explained what he knew was about to transpire, Sergeant Caporale told the Plaintiff "I **feel what you are saying, and** I **cannot say that it will not happen because me and you both know that it has".**

128.   With full understanding of the unlawful actions which were about to transpire, Plaintiff Falcon took the only available option, which was to call for an ambulance, in which the Plaintiff would be taken to an independent hospital: NYU Langone Medical Center.

129.   When the ambulance arrived, NYPD Officer Tilan of the 72nd Precinct entered the ambulance without permission and without any request from the Pla1ntiff or on sight Emergency Med1cal Service (EMS) personnel.

130.   Plaintiff Falcon made several requests for NYPD Officer Tilan to exit the ambulance, at which time EMS personnel also requested that Officer Tilan exit the ambulance.

131. Despite clear protestations from Plaintiff Falcon, upon exiting the ambulance, Officer Tilan requested to know where Plaintiff Falcon was being taken. However, both the EMS and the Plaintiff refused to disclose this information to him.

132.   Once the ambulance began driving away, Sgt. Caporale and NYPD Officer Ng then followed the Plaintiff in an unmarked vehicle, while Officer Tilan and Baggs also followed the ambulance in a marked vehicle, all the way to NYU Langone.

_____

133.   Upon arrival at NYU Langone Medical Center, uniformed officers and Sgt. Caporale entered the hospital with PLAINTIFF Falcon and followed him around, giving the impression that Plaintiff Falcon was being detained.

134.   However, Plaintiff Falcon had not been placed under arrest and was not lawfully detained under any of the levels of lawful suspicion, which were required to detain Plaintiff Falcon for a prolonged period of time. Plaintiff Falcon further stated numerous times to hospital personnel that he was not under arrest nor did he require any assistance from the NYPD.

135.   Hospital staff intervened and requested that NYPD personnel leave because PLATNTIFF was a patient and not a prisoner.

136.   At this time, Defendant NYPD Personnel then secured the exterior of the hospital, creating a perimeter around Plaintiff Falcon which was meant to prevent Plaintiff Falcon from leaving the hospital.

137.   Defendants summoned the NYPD Chief District Surgeon to NYU Langone in an effort to personally request the release of Plaintiff Falcon into the custody of the NYPD.

138.   When the NYPD Chief District Surgeon arrived at the hospital, he made the request for Plaintiff to be turned over to the NYPD. When the physician attending to Plaintiff Falcon rejected this request, the Chief District Surgeon then requested a 72 hour hold for observation to be placed.

139.   Again, the attending physician rejected the NYPD's request and stated in sum and substance that an independent evaluation of the Plaintiff would need to be conducted.

140.   In the days that followed the unlawful incident at NYU Langone, Plaintiff Falcon was contacted in confidence by members of the NYPD, that there was in fact a plan and conspiracy to place the Plaintiff in a psychiatric hold, so that the Defendants could seize Plaintiffs phone with any and all information that Plaintiff had amassed as evidence to support his case of discrimination ,

retaliation, a hostile work environment, the deprivation of his constitutional rights, and official misconduct.

141. On or about January 17, 2019, after taking several days to care for his special needs child, Plaintiff was forced to undergo a second psychiatric evaluation immediately after returning to work.

142. The psychological evaluation was performed by NYPD Psychological Services at Lefrak Hospital by Doctor Ng.

143. The interview with Plaintiff Falcon lasted around three hours and forty-five minutes. The recorded interview did not include an interactive discussion. Rather, the Defendant NYPD's doctor, leveled multiple baseless accusations against Plaintiff Falcon which inc1uded the outlandish accusation that Plaintiff would walk around the office clinching a duffle bad which contained five handguns.

144. At no time in Plaintiffs life has he ever clinched a duffle bag in the office containing five handguns.

145. With no clear and convincing evidence that Plaintiff Falcon was a threat to anyone or himself; or any evidence of the baseless accusations, the NYPD's Dr. Ng refused to clear Plaintiff Falcon because "more information was needed to make a decision."

146. The Defendant never informed Plaintiff Falcon of his duty stat us, nor was Plaintiff Falcon given a voucher for the personal property that was confiscated by Defendants.

147. Defendants never gave Plaintiff Falcon back his NYPD Identification card, nor was Plaintiff ever issued a new NYPD Identification card which displayed his duty status.

148. Throughout this ordeal, Defendants left the Plaintiff in limbo for weeks, without telling the Plaintiff who to report to for work.

149. In the days and weeks that followed the NYU Langone incident, Defendant NYPD Sgt. Williams from the NYPD's Chief of Detectives Investigations Unit was tasked by the

Defendants to conduct an investigation against Plaintiff Falcon, in an effort to amass minor violations (write ups) against the Plaintiff and discredit any of the Plaintiff's constitutionally protected complaints.

150. In or around mid-January 2019, Defendant Sgt. Williams, without any credible or reasonable suspicion, launched an investigation related to Plaintiff Falcon's personal firearm.

151. On or about January 17, 2019, the day Plaintiff Falcon returned to work after several days off, Defendant Sgt. Williams was present inside the 72nd Precinct Detective Squad Office and never spoke to or made any requests to speak with the Plaintiff, he only watched the Plaintiff.

152. Upon information and belief, Defendant Sgt. Williams launched an investigation against Plaintiff Falcon as part of a fishing expedition in an attempt to show that Plaintiff Falcon still possessed firearms despite his "restricted" status at the NYPD which required the Plaintiff to turn over all weapons.

153. This fishing expedition was launched as a result of the previous search that was conducted at Plaintiff Falcon's house in or around the time that Defendants attempted to unlawfully commit the Plaintiff to a psychiatric facility.

154. At the time of the previous search, even though all the Plaintiffs weapons were confiscated by Defendant Sgt. Caporale, Defendant Caporale left behind one piece of a firearm, otherwise known as a " Sig P320" trigger mechanism. This mechanism was dissembled, posed no threat to safety, nor did Defendant Caporale request the disassembled piece, despite observing it in plain sight while conducting the previous search of Plaintiff's residence.

155. However, upon information and belief, the aforementioned "Sig P320" was considered to be a firearm by law enforcement. Defendants Williams and Caporale, conspired against the Plaintiff to use the "Sig P320" as bait, in order to prove that Plaintiff Falcon was violating the NYPD orders which categorized Plaintiff Falcon as a restricted member of the NYPD who was unable to hold any firearms.

156.   Defendant Wi1liams' unlawful fishing expedition continued when on or around January 18, 2019, Defendant Sgt. Williams came to Plaintiff Falcon's residence on his day off and began banging on his door.

157.   In fact, Defendant Sgt. Williams began to knock on neighbors' doors, asking questions about Plaintiff Falco n, which made other tenants in Plaintiffs building very uneasy, fearful and caused alarm to all of the Plaintiffs neighbors.

158.   With full knowledge that Defendant Sgt. Caporale intentionally left the dissembled Sig P320 behind on the previous search, Defendant Sgt. Williams called Plaintiff Falcon on his cell phone and demanded that the Plaintiff open his door for a warrantless search.

159.   Defendant Sgt. Williams then demanded to know Plaintiff's exact location under the guise that he was conducting an official NYPD investigation.

160.   Next, without a warrant or any exception to the warrant requirements, Defendant Sgt. Williams demanded that Plaintiff Falcon come to the 72nd Precinct with the "Sig P230," which would allow the Defendants to arrest Plaintiff Falcon for Criminal Possession of a Weapon on account of the Plaintiff's restricted status.

161.   Upon information and belief, Defendant Sgt. Williams conspired with other Defendants to arrest the Plaintiff for possession of the dissembled mechanism which would permit the Defendants to obtain a search warrant of Plaintiff Falcon's residence.

162.   Upon information and belief. Defendant Williams and other Defendant co-conspirators needed such a warrant to enter Plaintiff Falcon' s residence so that they could search for any and all materials related to Plaintiff's case and destroy such evidence.

163.   Defendant Sgt. Williams deprived Plaintiff Falcon of his constitutional rights by trying to falsely arrest and maliciously have the Plaintiff prosecuted.

164.   Defendant Sgt. Williams and his co-conspirators knew, should have known, and/or were deliberately indifferent towards the Plaintiffs due process rights as an NYPD Officer  which

provided (i) Absent any exigent circumstance or limited exception, the Plaintiff had to be questioned during business hours or tours of duty and (ii) During the questioning or interrogation of an officer, the questioning was to be conducted with a union representative and union attorney present.

165.   Defendant Sgt. Williams had numerous opportunities to request the Plaintiff's presence for questioning throughout the week of January 11, 2019 but ignored all such opportunities.

166.   On or about February 7, 2019, the Defendants ordered Plaintiff Falcon to the Lefrak Plaza base for a second psychological evaluation.

167.   The Defendants' Dr. Ng once against performed the psychological evaluation.

168.   Dr. Ng used an NYPD generated form known as a UF-49, in order to complete her evaluation.

169.   Despite Plaintiff never having an incident or disciplinary proceeding launched against him, Dr. Ng informed the Plaintiff of egregious behavior on the part of Plaintiff Falcon as cited by supervisors of the 72nd Precinct.

170.   The behavior included but was not limited to the false and defamatory allegation that Plaintiff Falcon walked around with a backpack full of guns. The defamatory allegation published to a third party and cited by the New York. Post in an article generate-0 on or about January 12, 2019.

171.   At the conclusion of Dr. Ng's exhausting two-hour fo11ow-up interview with Plaintiff Falcon, Dr. Ng attempted to have the Plaintiff sign a clinical visitation slip.

172.   The slip would reverse Plaintiff Falcon's status as an NYPD member from "Restricted" to "Full Duty."

173.   However, Plaintiff Falcon observed that within the comments section of the slip, the Plaintiff would still be stripped of his weapons and shield due to a "temporary psychological hold."

174.  Upon information and belief, Defendant NYPD has never classified any officers' status duty as a "temporary psychological hold" because such status does not existence within the NYPD's guidelines.

175.  After Plaintiff Falcon made the observations of the psychological hold, he questioned the validity of the paperwork.

176.  When Plaintiff began questioning the paperwork, Dr. Ng, along with several members of the NYPD's Psychological Services Section, approached the Plaintiff to apologize, by referring to the paperwork as a misunderstanding and a mistake.

177.  Dr. Ng then requested the fraudulent paperwork be given back and that Plaintiff Falcon be returned back to his command at the 72nd Precinct Detective Squad.

178.  Plaintiff Falcon did not return the paperwork because he knew that it was potential evidence.

179.  The very next day, on or about February 8, 2019, Plaintiff Falcon was quietly reinstated back to full duty and was given back his weapons and shield.

180.  Soon thereafter and on account of the Plaintiff remaining steadfast despite the Defendants trying to ruin his career, Defendant Mccartan ordered Plaintiff Falcon into his office and asked the Plaintiff: "What unit do you want to go to?"

181.  Plaintiff Falcon advised Defendant Mccartan that he was interested in being transferred to the NYPD's Intelligence Bureau ("INTEL") since Plaintiff met all of the perquisite requirements for joining Intel which detects and disrupts criminal and terrorist activity through the use of intelligence-led policing.

182.  Upon information and belief, Defendants retaliated against the Plaintiff and refused to transfer Plaintiff Falcon to INTEL; even though the Plaintiff was qualified, interviewed for such a position, and was deemed to be a favorable candidate by one of the INTEL Captains.

183. Later in the month, the Defendants ordered Plaintiff Falcon to become the subject of an interrogation which was going to be held by Defendant Sgt. Williams, the Chief of the Detective's Investigations Unit.

184. On or about March 11, 2019, Plaintiff Falcon attended the interrogation as ordered, which was purely retaliatory in nature.

185. During this interrogation, Defendant Sgt. Williams advised Plaintiff Falcon of the reasoning for the meeting.

186. Defendant Williams told Plaintiff that he was being disciplined for shopping while on duty, which was a violation of Defendants' "Holiday Integrity Program" that prohibited "Uniformed Police Officers" from doing any Christmas or Holiday shopping.

187. Since Plaintiff has been appointed and stationed at the 72nd Precinct Detective's Squad, Plaintiff has never observed nor been made aware of any similarly situated Detective who was disciplined for doing Holiday shopping.

188. In fact, Plaintiff Falcon observed that Holiday shopping was quite routine and permitted by supervisors at the 72uct Precinct.

189. During Defendant Williams' interview of Plaintiff Falcon, seldom did he mention the violation of the NYPD's Holiday Shopping rules. Instead, Defendant Williams focused his questioning on Plaintiff Falcon's filed claims with the Federal EEOC.

190. The purpose of the interrogation was to extract information from the Plaintiff regarding his protected complaints of discrimination, retaliation, hostile work environment, the deprivation of Plaintiffs Constitutional rights and the reporting of official misconduct.

191. From the date of the original complaints to Defendant Sgt. Guerra and most notably, since the date of Plaintiff Falcon's original NYPD EEO complaint, members of the 72nd precinct detective squad have intention ally ignored and ostracized the Plaintiff, by denying him assistance with casework that requires special attention of a law enforcement nature.

192. Again, the unlawful retaliation and hostile work environment against Plaintiff Falcon was so consistent that it suggested such behavior was condoned by the Defendants.

193. As much discrimination, retaliation and hostility that the Plaintiff was forced to endure despite complaints; the Plaintiff remained resilient in his work activities despite suffering from emotional distress.

194. The actions taken against Plaintiff Falcon had everything to do with discrimination, sexual harassment, assault, retaliation and a hostile work environment. They were not due to Plaintiff Falcon' work performance because in fact Plaintiff Falcon always went above and beyond to perform his job.

195. The above also demonstrates that the Defendants failed to properly investigate Plaintiff Falcon' complaints and as a result of the duration of time it took to investigate, Plaintiff Falcon suffered further acts of discrimination, retaliation and hostility.

196. The above facts, which constitute a violation of the law, were a proximate and legal cause of the Plaintiffs injuries.

197. Defendants failed to properly supervise, train and discipline employees, agents, servers and/or others under its control about discrimination, sexual harassment, sexual assault and retaliation.

198. The above are just some examples of many in which Defendants either explicitly or implicitly unlawfully discriminated against Plaintiff Falcon and deprived him of his constitutional rights.

199. As a result of the unlawful discrimination, sexual harassment, assault, and retaliation by the Defendants which created an unbearable hostile work environment in the workplace, Plaintiff Falcon suffered from emotional distress.

200. Recently, Defendants transferred Plaintiff Falcon to the NYPD's Narcotics Bureau in Brooklyn, even though Plaintiff was qualified for a transfer into INTEL.

201. Since the filing of Plaintiff Falcons initial protected Complaint in the Eastern District of New York, the Defendants have subjected Plaintiff Falcon to a litany of additional retaliatory acts.

202. Defendants ordered the Plaintiff to visit the NYPD's Risk Mitigation Bureau where the Plaintiff was informed, he would be placed on "Performance Monitoring."

203. Performance Monitoring is an NYPD classification which places the accused under extra scrutiny from the NYPD for alleged major violations.

204. The Performance Monitoring of the Plaintiff was predicated on a minor infraction for "holiday shopping" while on company time.

205. The investigation for such a minor infraction was conducted by Defendant WONG, who is directly implicated in Plaintiff's protected EEO complaints, EEOC Complaint, and in Plaintiff's Federal Court Complaint.

206. Defendant WONG went as far as subpoenaing Plaintiff's bank records and a video from the mall in which it is alleged that Plaintiff Falcon went "holiday shopping."

207. Upon information and belief, Defendants subjected only the Plaintiff to such harsh scrutiny for the alleged minor violation, since it is common practice and policy within the NYPD for officers to go on holiday shopping.

208. Initially, Defendants opened an unsubstantiated investigation against the Plaintiff for other violations which had no merit, and therefore decided to charge the Plaintiff with the minor infraction of holiday shopping which Defendants indicated on their General Order to the Plaintiff.

209. To date, Defendants continue to place Plaintiff Falcon on Performance Monitoring and have indicated that the monitoring is to be extended and indefinite, though Defendants gave the Plaintiff no actual reason for this extension.

210. In addition, upon information and belief, such Performance Monitoring should only be issued or extended when the accused has been suspended or arrested during duty, and in this case the Plaintiff falls under neither category.

211. Recently, Defendants attempted to further penalize the Plaintiff by refusing him overtime and denial of any paid detail, despite granting overtime to all other officers similarly situated. In fact, many officers rely on paid details as a part of their regular salary since most if not all officers other than Plaintiff Falcon are granted such overtime and paid details.

212. Defendants are also attempted to penalize Plaintiff with additional Performance Monitoring from unsubstantiated and/or minor infractions from over eight years ago, which Plaintiff was never

disciplined for before.

213. At or around this same time period, Defendants also advised the Plaintiff that in order to qualify for FMLA on behalf of Plaintiff's disabled daughter, the Plaintiff would need to undergo routine breathalyzer tests. However, the Plaintiff does not have, nor has the Plaintiff ever had or even been suspected of alcohol use. The aforementioned required are merely pretexual and being used as an illegitimate reason to further subject the Plaintiff to materially adverse actions.

214. The above actions represent just some of the retaliatory and discriminatory acts that the Defendants have subjected the Plaintiff to at work.

215. The Plaintiff continues to be subjected to unfounded reprimands and disciplinary actions which signal an ongoing violation of the Plaintiff's Constitutionally protected rights.

## AS AND FOR *A* FIRST CAUSE OF ACTION
## DISCRIMINATION UNDER TITLE VII
## <u>(Not Against Individual Defendants)</u>

216.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this

complaint.

217.    Title Vll states in relevant part as follows:

(a) Employer practices:

It shall be an unlawful employment practice for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate
against any individual with respect to his compensation, terms, conditions, or privileges
of employment, because of such individual's race, color, religion.  sex, or national origin;

218.    This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, for relief based upon the unlawful

employment practices of the above-named Defendants. Plaintiff complains of Defendants'

violation of Title VII's prohibition against discrimination in employment based, in whole or in

part, upon an employee's sex.

219.    Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e et seq., by

terminating and otherwise discriminating against Plaintiff as set forth herein.

## AS A SECOND CAUSE OF ACTION FOR
## DISCRIMINATION UNDER TITLE VU
## <u>(Not Against Individual Defendant)</u>

220.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this

complaint.

221.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e-3(a) provides that it

shall be unlawful employment practice for an employer: "(l) to ... discriminate against any of

his employees ...  because he has opposed any practice made an unlawful employment practice

by this subchapter, or because he has made a charge, testified, assisted or participated in any

manner in an investigation, proceeding, or hearing under this subchapter."

222. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e seq. by discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of his opposition to the unlawful employment practices of Defendants.

## AS A THIRD CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINIS1RATIVE CODE
### (Not Against Individual  Defendants)

223. Plaintiff repeats, reiterates and real1eges each and eve!)' allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

224. The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

225. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-1070) (a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against the Plaintiff as set forth herein.

## ASA FOURTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMJNIS1RATIVE CODE
### (Not Against Individual Defendants)

226. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

227. The New York City Administrative Code Title 8, §8-107(l)(e) provides that it shall be unlawful) discriminatory practice: "For an employer... to discharge ... or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter..."

228. Each of the Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(l)(e) by discriminating against the Plaintiff because of Plaintiffs

opposition to the unlawful employment practices of Plaintiffs employer.

## AS A FIFTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
### (*As* Against Individual Defendants)

229. Plaintiff repeats, reiterates and rea11eges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at  length.

230. New York City Administrative Code Title 8-107(19) Interference with protected rights. It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected pursuant to this section.

231. Defendants violated the section cited herein as set forth.

## AS A SIXTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
### (As Against Individual Defendants)

232. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

233. The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

234. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-l07(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

## AS A SEVENTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
### (Not Against Individual Defendants)

235. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

236.  New York City Administrative Code Title 8-107 (13) Employer liability for discriminatory c-0nduct by employee, agent or independent contractor,

    a.  An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

    b.  An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

    (l) the employee or agent exercised managerial or supervisory responsibility; or

    (1) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

    (2) the employer should have knowledge of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

237.  Defendants violated the section cited herein as set forth.

## AS AN EIGTH CAUSE OF ACTION FOR DISCRIMINATION UNDERSTATE LAW
### {Not Against Individual Defendants)

238.  Executive Law § 296 provides that "L It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex., disability, predisposing genetic characteristics, marital status, or domestic violence victim status., to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or

privileges of employment"

239.   Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff as

set forth herein.

240.   Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of Executive

Law Section 296.

## AS A NINTH CAUSE OF ACTION FOR
## DISCRIMINATION UNDER STATE LAW
### (As Against Individual Defendants)

241.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this

complaint.

242.   New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice:

For any person engaged in any activity to which this section applies to retaliate or discriminate

against any person because [s]he has opposed any practices forbidden under this article."

243.   Defendants engaged in an unlawful discriminatory practice by discharging, retaliating, and otherwise

discriminating against the Plaintiff because of Plaintiff s opposition to the unlawful employment

practices of Plaintiffs employer.

## AS A TENTH CAUSE OF ACII0N FOR
## DISCRIMINATION UNDER STATE LAW
### (As Against Individual Defendants)

244.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

245.   New York State Executive law  §296(6) provides that it shall be an unlawful discriminatory practice:

"For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this

article, or attempt to do so."

246.   Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive

Law §296(6) by aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

## AS AN ELEVENTH CAUSE OF ACTION FOR
## ASSAULT & BATTERY
### (*As* Against Individual Defendant Guerra)

247.   Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of the Complaint as set forth at length herein.

*248.*   Under New York law, assault is the (i) intentional placing (ii) of another person (iii) in reasonable apprehension (iv) of imminent harmful or offensive contact. *See United Nat. Ins. Co. v. Waterfront N.Y Realty Corp., 994 F.2d 105, 108 (2d. Cir. 1993).*

249.   Under New York law, as a result of the assault, a Defendant commits a battery when (i) there was bodily contact, (ii) the contact was offensive and (iii) the defendant intended to make the contact.

250.   Under the applicable law a Plaintiff may invoke the doctrines of equitable tolling or equitable estoppel because in the current case, Plaintiff was induced by Defendant Guerra to refrain from filing a timely action and Defendant Guerra took affirmative steps to conceal her actions against the Plaintiff and the wrong itself was of such a nature to be self-concealing.

251.   Defendant Guerra intentionally placed Plaintiff Falcon in reasonable apprehension of imminent harmful and offensive physical contact as she first attempted to make offensive contact against the Plaintiff.

252.   Defendant Guerra did in fact intentionally make offensive contact with Plaintiff Falcon after using her hand to shove her soiled underwear onto the Plaintiffs face and into the Plaintiffs mouth.

253.   Defendant Guerra committed assault and battery and is liable to the Plaintiff for her injuries, for which Plaintiff claims damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
## VIOLATION OF RIGHTS SECURED BY 42 U.S.C. §1983
## (Against All Defendants)

254.    Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

255.    42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom  or usage of
> any state or territory or the District of Columbia subjects or causes to be subjected any
> citizen of the United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges or immunities secured by the constitution and law
> shall be liable to the party injured in an action at law, suit in equity, or other appropriate
> proceeding for redress

256.    In committing the acts of discrimination and retaliation complained of herein, the Defendants acted jointly and under color of state law to deprive Plaintiff Falcon of his clearly established constitutionally protected rights under the Fourteenth Amendment of the United States Constitution.

257.    Plaintiff in this action is a citizen of the United States and all of the individual firefighter Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

258.    An employee may bring a retaliation claim under §1983 against a supervisor who, acting under color of law, retaliates against him for opposing discrimination in the terms of his employment.

259.    Defendants violated the above statute through multiple acts of unlawful gender and racial discrimination, sexual harassment, and retaliation.

## THIRTEENTH CAUSE OF ACTION
## (Individual Supervisory Liability - 42 U.S.C. § 1983)

260.    Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

261.    Individual Defendants DiDonato, Menoni, McCartan, Guerra and Wong, were at all relevant times, supervising officers in the NYPD, with oversight responsibility for the training, instruction and supervision of the Plaintiff.

262.    Defendant DiDonato, Menoni, McCartan, Guerra and Wong knew or should have known that their behavior, taken under the color of law, was illegal and deprived the Plaintiff of his

constitutional rights.

263. Defendants DiDonato, Menoni, McCartan, Guerra and Wong further failed to intervene to prevent the clearly discriminatory and retaliatory actions taken against Plaintiff.

264. On information and belief, Defendants DiDonato, Menoni, McCartan, Guerra and Wong were personally involved in either effectuating, ordering, or failing to take preventative and remedial measures to guard against the unconstitutional discrimination and retaliation against Plaintiff. Defendants DiDonato, Menoni, Mccartan, Guerra and Wong also knew, or in the exercise of due diligence, should have known, that the unconstitutional actions taken against Plaintiff Falcon were discriminatory in nature and retaliatory.

265. The failure of the individual supervisory Defendants to supervise and/or discipline each other, or any of the aforementioned Defendants with respect to their unlawful discrimination and retaliatory actions amounted to gross negligence , deliberate indifference or intentional misconduct, which directly and proximately caused the injuries and damages to Plaintiff set forth herein.

## FOURTEENTH CAUSE OF ACTION
### (EQUAL PROTECTIONS - 42 U.S.C. § 1983)

266. Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

267. Individual DiDonato, Menoni, Mccartan, Guerra and Wong, were at all relevant times, supervising employees in the NYPD, with oversight responsibility for the training, instruction and supervision of the Plaintiff.

268. Defendants DiDonato, Menoni, McCartan, Guerra and Wong, were at all relevant times, supervising employees and Captains of the NYPD, with oversight responsibility for the training, instruction and supervision of the Plaintiff.

269. The above-named Defendants and City Defendants were fully aware of Defendant Guerra's unlawful behavior in the workplace and were further aware of any unlawful and discriminatory behavior that the Plaintiff was subjected to in the workplace.

270. Plaintiff was harassed in the workplace on account of his gender and such actions were taken against him by Defendants who acted under the color of state law.

271. The harassment and retaliation by Defendants as taken against the Plaintiff was so severe as to render the work environment as hostile to the Plaintiff.

272. Defendants did not properly monitor the workplace, failed to respond to Plaintiffs complaints, and effectively discouraged Plaintiff from filing additional complaints and protecting himself in the workplace.

273. Defendants provided no reasonable avenue for the Plaintiffs complaints and even when they did receive complaints, the Defendants failed to respond or address the complaints in any way.

### FIFTEENTH CAUSE OF ACTION
### (EQUAL PROTECTIONS- 42 U.S.C. § 1983)

274. Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

275. The aforementioned sexual harassment Plaintiff was forced to endure at the hands of Supervisors amounts to gender discrimination.

276. Supervisor Guerra subjected the Plaintiff to a litany of sexual and gender related remarks which culminated in a sexual assault taken against the Plaintiff on account of the Plaintiff's gender.

277. The ensuing acts of sexual harassment and gender discrimination and retaliation committed by Defendants were based on the Plaintiffs gender, as a female employee would not have been subjected to the same treatment.

### SIXTEENTH CAUSE OF ACTION
### (*Monell* Claim - 42 U.S.C. § 1983- Against City of New York/NYPD)

278. Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

279. All of the acts and omissions by the Defendants described above, with regard to the unreasonable, unlawful, and retaliatory discrimination against Plaintiff were carried out pursuant to overlapping *de facto* policies and practices of the City which were in existence at

the time of the conduct alleged herein and were engaged in with the full knowledge, conse nt, and cooperation and under the supervisory authority of Defendant City of New York and its agency, the NYPD.

280.   Defendant City of New York and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual wrongful acts of the Defendants and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

281.   The named Defendants and their superiors, with full knowledge of the unlawful actions taken against the Plaintiff, had final decision-making authority.

282.   Defendants failed to properly train and/or supervise their subordinates which includes the named Defendants.

283.   Defendants' actions amount to deliberate indifference against the Plaintiff who was deprived of due process and deprived of his constitutional rights.

## SEVENTEENTH CAUSE OF ACTION
## VIOLATION OF RIGHTS SECURED BY 42 U.S.C. §1985
## (Against All Defendants)

284.   Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

285.   Section 1985(3) provides, in relevant part, that:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws ... in any case of conspiracy set forth  in this section, if one or more persons engaged  therein do, or cause to  be done, any act in  furtherance of     the object of such cons piracy, whereby another is injured in his person or property ... the party so injured or deprived may have an action for the recovery of  damages, occasioned by such injury or deprivation, again at any one or more of the  conspirators.

286.   All of the aforementioned Defendants acted either, directly or indirectly, in unlawfully discriminating and retaliating against Plaintiff on the basis of gender.

287.   Similarly, all of the aforementioned Defendants acted, either directly or indirectly, to cover-up the unlawful discriminatory and retaliatory actions against  Plaintiff.

## EIGHTEENTH CAUSE OF ACTION
### VIOLATION OF RIGHTS SECURED BY 42 U.S.C. §1986
### (Against All Defendants)

288.  Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

289.  Defendants failed to prevent a conspiracy amongst the NYPD employees to deprive Plaintiff of

   rights protected by the United States Constitution.

290.  Specifically, Defendants failed to prevent the execution of systematically discriminatory and

   retaliatory actions against Plaintiff.

291.  As a result, Defendants violated the above statute.

## NINETEENTH CAUSE OF ACTION
### WHISTLEBLOWER PROTECTION ACT
### UNDER THE NEW YORK CITY ADMINISTRATIVE CODE 12-113
### (Against All Defendants)

292.  Plaintiff repeats, reiterates and realleges each and every allegation made m the above paragraphs

   of this Complaint as if more fully set forth herein at length.

293.  b. 1. No officer or employee of an agency of the city shall take an adverse personnel action with

   respect to another officer or employee in retaliation for his or her making a report of information

   concerning conduct which he or she knows or reasonably believes to involve corruption, criminal

   activity, conflict of interest, gross mismanagement or abuse of authority by another city officer

   or employee , which concerns his or her office or employment, or by persons dealing with the

   city, which concerns their dealings with the city, (i) to the commissioner, or (ii) to a council

   member, the public advocate or the comptroller, who shall refer such report to the commissioner.

   For purposes of this subdivision, an agency of the city shal1 be deemed to include, but not be

   limited to, an agency the head or members of which are appointed by one or more city officers,

   **and** the offices of elected city officers.

294.  Defendants took adverse employment actions and retaliated against the Plaintiff a public

   officer, for making a report/protected complaint of corruption, criminal activity, conflict of

   interest, gross mismanagement and abuse of authority regarding the above-named individual

defendants and their co-conspirators.

295. The above conduct was complained of by the Plaintiff to the New York City Department of Investigations (DOI).

296. Plaintiff also filed a complaint with the Office of the Inspector General.

297. As a further result of Plaintiff's complaints, Defendants retaliated and continue to retaliate against the Plaintiff.

298. Defendants violated the above New York City statute and thus Plaintiff is entitled to all remedies existing under the law.

**TWENTIETH CAUSE OF ACTION**
**FALSE IMPRISONMENT**
**(Against All Defendants)**

299. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

300. Defendants willfully and intentionally detained the Plaintiff by forcing Plaintiff into a psychiatric facility for an unlawful psychiatric evaluation.

301. The false imprisonment committed by the Defendants was committed without the Plaintiff's consent and was not taken pursuant to any lawful action.

**TWENTY FIRST CAUSE OF ACTION**
**NYC ADMINISTRATIVE CODE 8-903**
**(Against Defendant Guerra)**

302. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

303. In relevant part, GMVA, N.Y.C. Code§ 8-904 provides, "[A]ny person claiming to be injured by an individual who commits a crime of violence motivated by gender as defined in section 8-903 of this chapter, shall have a cause of action against such individual."

304. Section 8-903 defined " cri me of violence" as "an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law... if the conduct

presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges."

305. Section 8-903 also provides that such an act is "motivated by gender" if it is "committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender."

306. In this case, Defendant Guerra (i) committed an act that constituted a felony when (ii) she presented a serious risk of physical injury and did in fact injure the Plaintiff when she sexually assaulted Plaintiff (iii) on account of his gender, (iv) when Plaintiff Falcon complained, Defendant Guerra developed or already had an animus toward the Plaintiff's gender, (v) which resulted in a serious right of physical injury to the Plaintiff who was in fact a male.

307. Defendant Guerra is liable to the Plaintiff under the OMVA in which Plaintiff Falcon claims damages in an amount to be determined at trial.

WHEREFORE, Plaintiff demands the following relief jointly and severally against all Defendants:

(a) a declaration that Defendants violated Plaintiff's federal and state civil rights;

(d) compensatory damages for the injuries suffered by Plaintiff by reason of Defendants' unlawful and unjustified conduct, in an amount just and reasonable and in conformity with the evidence at trial in an amount to be determined at trial;

(c) punitive damages against the individual Defendants assessed to deter such intentional and reckless deviations from well-settled constitutional standards, to the extent applicable by law;

(d) damages for emotional distress, lost wages, back pay, front pay, statutory damages, medical expenses, interest;

(d) reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and all other applicable laws; and

(e) such other and further relief as appears just and proper.

Dated: New York, New York
November 27, 2019

L & D LAW P.C.

_____/s/_____
Paul Liggieri, Esq.
11 Broadway, Suite 615
New York, NY 10004
(212) 374-9786
*Attorneys for Plaintiff*